ROCKFORD METROPOLITAN EXPOSITION AUDITORIUM AND OF-FICE BUILDING AUTHORITY, Petitioner-Appellant, v. THE ILLINOIS STATE LABOR RELATIONS BOARD *et al.*, Respondents-Appellees.

Second District    No. 2—91—0529

Opinion filed February 6, 1992.

Carl A. Ecklund and Stephen E. Balogh, both of Williams & McCarthy, P.C., of Rockford (Elmer C. Rudy, of counsel), for petitioner.

Roland W. Burris, Attorney General, of Springfield, and Jacalyn J. Zimmerman, of Illinois State Labor Relations Board, of Chicago (Jennifer A. Keller, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois State Labor Relations Board.

Jacobs, Burns, Sugarman & Orlove, of Chicago (Charles Orlove, of counsel), for other respondent.

JUSTICE GEIGER delivered the opinion of the court:

The Rockford Metropolitan Exposition Auditorium and Office Building Authority (Metro Centre) appeals from the Illinois State Labor Relations Board's (the Board's) decision which found that Metro Centre engaged in unfair labor practices in violation of sections 10(a)(1), (a)(2) and (a)(4) (Ill. Rev. Stat. 1989, ch. 48, pars. 1610(a)(1), (a)(2), (a)(4)) of the Illinois Public Labor Relations Act (the Act) (Ill. Rev. Stat. 1989, ch. 48, pars. 1601 through 1627). The case was originated by the respondents, Local 217 (Local 217) of the International Alliance of Theatrical Stage Employees (Union), the local members of the Union. The Board awarded back pay to certain members of Local 217. Metro Centre argues on appeal that: (1) the employees are not "public employees" under section 3(n) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1603(n)); (2) that there exists no historical bargaining relationship between Local 217 and Metro Centre; (3) that Metro Centre did not commit unfair labor practices by refusing to bargain with the Union; and (4) that Metro Centre did not discriminate against Union workers.

The Metro Centre is a year-round venue for theatrical performances and sporting events. It is a municipal corporation established

by the Rockford Civic Center Act (Ill. Rev. Stat. 1989, ch. 85, par. 1331 *et seq.*) and is a public employer under section 3(o) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1603(o)). All events at the Metro Centre fall into one of two categories: "yellow card" and "non-yellow card" shows. Yellow card shows involve a contract between the producers of an event and the Union's parent organization, the International Alliance of Theatrical State Employees and Moving Picture Machine Operators of United States and Canada (IATSE). The terms of those contracts require the show to utilize a certain number of workers referred by IATSE local unions at each venue.

In yellow card shows, the agreement established by IATSE and the producers of an event sets the wages, hours and other terms and conditions of employment for workers referred by Local 217. In non-yellow card shows there is no yellow card contract between the producer of the show and the IATSE. For these shows, the Metro Centre employs its own permanent staff of stagehands and supplements that staff when needed. Some of its permanent employees are also members of the stagehand union. The Metro Centre has, however, utilized the services of Local 217 spotlight operators on all shows including the non-yellow card shows.

The Metro Centre's exclusive use of Local 217 spotlight operators dates back to an agreement embodied in two memoranda dated January 23, 1981, and April 14, 1982. The agreement reached in the memoranda defined the terms and wages for employees referred by Local 217 for all yellow card shows. In addition, the memoranda states that on all non-yellow card shows the Metro Centre will use spotlight operators referred by Local 217. The preamble of each memoranda states that "this memorandum shall not be construed as recognition by the Metro Centre of the [Union] in any formal way nor does the Metro Centre agree to bargain collectively in any manner with any of its employees." Since the date of the second memorandum in 1982, no further written agreements have been entered into between Local 217 and Metro Centre.

For both yellow card and non-yellow card shows, Local 217 selects workers to send to the Metro Centre. The Metro Centre does not have any control over which local members are referred for any particular show. The spotlight operators are free to decline a referral without being subject to discipline by the Metro Centre. The Metro Centre pays Local 217 a lump sum for the services provided by its workers. Local 217 keeps a portion of the money for Union dues, fees, social security and income tax withholding. Until July 13, 1990, it also kept a share for worker's compensation insurance.

After making these deductions, Local 217 pays the individual workers.

While at the Metro Centre, spotlight operators are under the control of the show's lighting director. Approximately 90% of the Metro Centre shows that use spotlight operators have lighting directors who are employees of the traveling show and are not Metro Centre employees. It is undisputed that Metro Centre has the right to send home and refuse further referrals of operators who have not properly performed their assignments. It also has the right to hold over operators to help stagehands after any performance.

Since the date of the 1982 memorandum, the relationship between the Metro Centre and Local 217 has been governed by that agreement, except with respect to wage provisions which have been adjusted periodically. From 1981 to the present, the Metro Centre and Local 217 met every 12 to 15 months to update their agreement. At the request of Local 217, on September 19, 1989, the parties exchanged written contract proposals to update their agreement.

The Metro Centre's proposed contract was identical to the 1982 agreement, except in regard to wages. It also contained the preamble disclaiming any recognition by the Metro Centre of Local 217 and of collective bargaining. The contract presented by Local 217 proposed to cover not only the spotlight employees but also stagehands, moving picture operators, carpenters, property men, electricians and others.

On August 23, 1989, according to the testimony of Local 217 negotiators, Bradley Walsh, the general manager of Metro Centre, stated that he did not want any Union stagehands working at the Metro Centre and that if the Union stagehands working in his building wanted more work, they should quit the Union.

Local 217 initiated this litigation on January 11, 1990, filing a charge of unfair labor practices against the Metro Centre pursuant to section 11 of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1611). Local 217 alleged that Metro Centre violated sections 10(a)(1), (a)(2), and (a)(4) by: (1) maintaining a policy designed to discourage membership in or representation by the Union; (2) discriminating against all members of the Union by refusing to hire them for available work; and (3) refusing to bargain collectively in good faith with the Union. A hearing officer heard the case on July 10, 1990. In his recommended decision and order, he found that the spotlight operators are public employees employed by Metro Centre; that the Metro Centre and Local 217 have a historical *de facto* bargaining

relationship with regard to the spotlight employees; and that the Metro Centre violated sections 10(a)(1), (a)(2), and (a)(4) of the Act by refusing to bargain in good faith with Local 217, the representative of the employees, and by discriminating against Union-referred stagehands. He awarded stagehands on Local 217's referral list back pay for lost wages incurred since July 1, 1984.

Both Local 217 and the Metro Centre filed timely exceptions to the hearing officer's recommended decision. On April 17, 1991, the Board issued its decision and order, agreeing with the findings of the hearing officer, but limiting the back pay award to the period beginning six months prior to filing of the charge. The Metro Centre brought this appeal.

■ Before we address the merits of this appeal, we first address a motion filed by the Metro Centre which we have taken with the case. The Metro Centre asks this court to strike the Union's statement of facts contained in Local 217's appellate brief. The Metro Centre argues that several passages in the Union's brief make no references to the pages of the record on appeal and that several passages constitute argument or comment, containing disputed testimony or facts but set forth as undisputed facts in violation of Supreme Court Rule 341(e)(6) (134 Ill. 2d R. 341(e)(6)).

We find adequate record references in Local 217's fact statement and find no reason to strike its statement of facts, and we will disregard any inappropriate comments therein. *James v. Shig Yasunaga* (1987), 157 Ill. App. 3d 450, 452.

We now address the merits on appeal. Metro Centre first argues that the Board incorrectly determined that the spotlight operators referred by Local 217 are "public employees" within section 3(n) of the Act. (Ill. Rev. Stat. 1989, ch. 48, par. 1603(n).) The Metro Centre asserts that the spotlight operators are independent contractors.

"Public employee" is defined under section 3(n) of the Act as any individual employed by a public employer but excluding independent contractors. (Ill. Rev. Stat. 1989, ch. 48, par. 1603(n).) The Metro Centre stipulated that it is a "public employer," as that term is used in section 3(n) of the Act. Both the Metro Centre and Local 217 agree that the test of whether the spotlight operators are "employees" is the one articulated by the Board in *Village of Bellwood,* 4 Pub. Employee Rep. (Ill.) par. 2042, case No. S—RC—88—79 (Illinois State Labor Relations Board, October 14, 1988).

■ The hearing officer and the Board relied on the *Bellwood* test to analyze the relationship between Metro Centre and the spotlight operators. As articulated in *Bellwood,* the analysis of whether

an individual is considered an "employee" must take into account the totality of the circumstances involving the employment nexus. The inquiry should include the regularity of the group members' employment, the presence of substantial turnover in the group's composition, the group members' expectation of continued employment, the group members' ability to refuse work without being subject to discipline, the number of hours worked, whether the individual group members are compensated for the services which are rendered and the form of compensation offered. *Village of Bellwood*, 4 Pub. Employee Rep. (Ill.) par. 2042, at X-305.

The hearing officer and the Board recognized that there were aspects of the relationship here that did not resemble an employer-employee relationship. They noted that the Metro Centre does not pay wages directly to the operators, does not withhold taxes or social security, provides no benefits, and, as a general rule, that the operators are free to decline a referral without being subject to discipline by the Metro Centre. However, their findings reflect that the Metro Centre's business is characterized by numerous engagements of short duration and that the Centre has merely delegated some of its functions as an employer to the Union. Additionally, the Board placed strong emphasis on the fact that Metro Centre supervises the work of the operators and determines their wages, hours, and other terms and conditions of employment as well as reserving the right to discipline those who fail or refuse to properly perform tasks assigned. See *National Labor Relations Board v. United Insurance Co.* (1968), 390 U.S. 254, 255-58, 19 L. Ed. 2d 1083, 1085-87, 88 S. Ct. 988, 989-90; *Cardinal McCloskey Children's & Family Services* (1990), 298 NLRB 55.

Under the Illinois Labor Relations Act and the Code of Civil Procedure, the Board's findings and conclusions on questions of fact are held to be *prima facie* true and correct. (Ill. Rev. Stat. 1989, ch. 48, par. 1611(e); ch. 110, par. 3—110.) A reviewing court may not reweigh evidence or make independent determinations of fact. (*Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 906.) We must confirm the Board's factual determinations unless they are contrary to the manifest weight of the evidence. *Rockford Township Highway Department v. Illinois State Labor Relations Board* (1987), 153 Ill. App. 3d 863, 872.

■ We have reviewed the full record and we find that the Board's findings that the spot operators are "employees" of the Metro Centre is not against the manifest weight of the evidence, as

several of the factors in the *Bellwood* test support this finding, as well as a sufficient indicium of control by the Metro Centre over the spotlight operators. (See *Village of Bellwood*, 4 Pub. Employee Rep. (Ill.) par. 2042, at X-305; *Cardinal McCloskey Children's & Family Services*, 298 NLRB 55.) We will not reverse the Board's findings. *Illinois Nurses Association v. Illinois State Labor Relations Board* (1990), 196 Ill. App. 3d 576, 582.

The second issue that the Metro Centre urges on appeal is that the Board erred in its determination that a historical bargaining relationship existed between it and Local 217's spotlight operators. The Metro Centre contends that the preamble language of the 1981 and 1982 memoranda and the lack of pre-Act bargaining between it and Local 217 preclude any historical recognition of the labor union. The respondents argue that the language of the preambles disclaimed the parties' intent to create formal recognition of a bargaining relationship, but does not serve to prevent the Centre's *de facto* historical recognition of a bargaining relationship.

The Board found evidence of only two meetings between the Metro Centre and Local 217 before the passage of the Act. There was an additional meeting in 1984, but there was no evidence of whether it took place before the Act was passed in 1984. The first two meetings in 1981 and 1982 resulted in a written agreement containing a preamble which expressly waived any formal recognition of the Union or the workers as a bargaining unit. The Board found that the Union could not have waived its right to *de facto* recognition because the statutory right of historical recognition had not been in existence at the time the memoranda were drafted and therefore the Union could not have knowingly relinquished that right. The Board found that the Metro Centre had historically recognized Local 217.

■ There are two forms by which an employer can "historically recognize" a labor union: those are formal and *de facto* recognition. (*Village of Worth*, 2 Pub. Employee Rep. (Ill.) par. 2045, case No. S—RC—259 (Illinois State Labor Relations Board, September 24, 1986).) Formal recognition occurs when an employer expressly admits that it recognizes the labor organization as the exclusive representative of a specified group of employees. (*City of Peoria v. Illinois State Labor Relations Board* (1988), 165 Ill. App. 3d 429, 434.) *De facto* recognition occurs when an employer, by its conduct, impliedly recognizes the labor organization as an exclusive representative of the employees in a specified unit. (*Peoria*, 165 Ill. App. 3d at 434-35.) *De facto* recognition is shown by evidence that the em-

ployer established, prior to the effective date of the Act, a practice of meeting with a labor organization to discuss the terms and conditions of employment. *Village of Oak Park v. Illinois State Labor Relations Board* (1988), 168 Ill. App. 3d 7, 16.

■ Metro Centre argues that under the Board's strained interpretation of the historical recognition provisions, no matter how clearly prior to the effective date of the Act the parties manifest their intentions of not establishing a bargaining relationship, one party can always claim *de facto* recognition where it never existed. Taking the facts in a light most favorable to Local 217, there was a single pre-Act meeting between the parties sometime in 1984. At that meeting, even if it occurred before the Act, the parties discussed only one topic: wages. The only other evidence of pre-Act negotiation activity between the Centre and the Local 217 consisted of the two memoranda which specifically waived recognition of the Union. At the meetings in 1981 and 1982, that resulted in the memoranda inconsistent with recognition of Local 217, there is no positive evidence of any pre-Act event upon which to establish a practice of recognition. See *Village of Worth*, 2 Pub. Employee Rep. (Ill.) par. 2045.

One meeting on one topic cannot rise to the level of practice to be contemplated by a court as establishing historical recognition. (*Cf. Village of Oak Park*, 168 Ill. App. 3d at 10-16 (13 meetings on 11 employment topics); *City of Chillicothe v. Illinois State Labor Relations Board* (1988), 165 Ill. App. 3d 217, 221-23 (20 meetings covering 5 employment topics); *Village of Worth*, 2 Pub. Employee Rep. (Ill.) par. 2045 (employment meetings over a 30-year period).) We find that the Board's conclusion that there was a historical bargaining relationship was against the manifest weight of the evidence. *Rockford*, 153 Ill. App. 3d at 872.

■ Another issue raised on appeal is whether the Metro Centre violated sections 10(a)(1) and (a)(4) of the Act by refusing to bargain in good faith with Local 217. (Ill. Rev. Stat. 1989, ch. 48, pars. 1610(a)(1), (a)(4).) The Board's finding that it did so presupposes that the Metro Centre had a duty to bargain with Local 217. As we have found that there was no historical bargaining relationship between the Metro Centre and Local 217, we further find that there was no duty to bargain with Local 217 and there can be no violation of sections 10(a)(1) and (a)(4) of the Act (Ill. Rev. Stat. 1989, ch. 48, pars. 1610(a)(1), (a)(4)).

The next issue raised on appeal is whether the Metro Centre violated sections 10(a)(1) and (a)(2) of the Act by discriminating

against Union-referred stagehands. Metro Centre argues that there can be no violation because there is no evidence of any adverse employment action taken against any individual Union employee.

■■ Section 10(a)(2) makes it an unfair labor practice for an employer "to discriminate in regard to hire or tenure of employment *** in order to encourage or discourage membership in or other support for any labor organization." (Ill. Rev. Stat. 1989, ch. 48, par. 1610(a)(2).) The *prima facie* elements of violation of sections 10(a)(1) and (a)(2) are: (1) an employee engaged in union activity; (2) knowledge by the employer of such activity; (3) anti-union animus harbored by the employer; and (4) adverse employment action taken under suspicious circumstances. (*American Federation of State, County, & Municipal Employees Council 31, AFL-CIO v. Illinois State Labor Relations Board* (1988), 175 Ill. App. 3d 191, 197.) Adverse employment action, the fourth *prima facie* element, need not take the form of employee discharge, but may be manifested in the refusal to hire a union employee. See *Phelps Dodge Corp. v. National Labor Relations Board* (1941), 313 U.S. 177, 186-187, 85 L. Ed. 1271, 1278-79, 61 S. Ct. 845, 848-49 (interpreting section 8(a) of the National Labor Relations Act); *Alexander Dawson, Inc. v. National Labor Relations Board* (9th Cir. 1978), 586 F.2d 1300, 1303.

■■ We find that there is no evidence of adverse employment action by the Metro Centre and no violation of sections 10(a)(2) and (a)(1) of the Act. There was no showing here that any individual employee was discharged for Union involvement. (See *Rockford Township Highway Department v. Illinois State Labor Relations Board* (1987), 153 Ill. App. 3d 863, 869 (where employees dismissed when they joined labor union).) There is also no evidence in the record that individual Union members were denied employment after seeking it from the Metro Centre (*cf. Phelps Dodge Corp.*, 313 U.S. at 186, 85 L. Ed. at 1278-79, 61 S. Ct. at 848-49 (where union strikers were refused employment after applying for reinstatement of their jobs)) or that any Union employee was harassed by Metro Centre (see *City of Chicago v. Illinois Local Labor Relations Board* (1988), 182 Ill. App. 3d 588, 594-95 (harassment of employee is sufficient to establish adverse employment action)). Absent a showing of adverse employment action, there cannot be a violation of sections 10(a)(1) and (a)(2) of the Act. (See *American Federation*, 175 Ill. App. 3d at 197.) With the absence of specific allegations of those or any other adverse employment actions, we find the Board's decision on this issue to be against the manifest weight of the evi-

dence. See *Rockford Township Highway Department*, 153 Ill. App. 3d at 872.

For the above reasons, we reverse the decision of the Illinois State Labor Relations Board.

Judgment reversed.

McLAREN and NICKELS, JJ., concur.